**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**JENNETTE R. VARNEY,**

      **Plaintiff,**

                                **Civil Action 2:14-cv-2100**
     **v.**                           **Judge James L. Graham**
                                **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Jennette R. Varney, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits and supplemental security income. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 15), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

1

## I.  BACKGROUND

This action involves Plaintiff's second set of applications for disability benefits.  Plaintiff initially filed for child disability insurance benefits and supplemental security income on August 11, 2006, alleging that she has been disabled since birth on November 27, 1981.  After Plaintiff's initial application and request for reconsideration were denied, she requested a *de novo* hearing before an administrative law judge.  Administrative Law Judge David A. Redmond held and evidentiary hearing and subsequently denied Plaintiff's applications on September 24, 2009.  (R. at 19, 86-104.)

Plaintiff thereafter filed her current applications for benefits on May 11, 2011, alleging that she has been disabled since September 22, 2009, due to a mood disorder/cyclothymic disorder, dystemia, and attention deficit hyperactivity disorder ("ADHD").  (R. at 226-32, 249-55, 267.)  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  Administrative Law Judge Mattie Harvin-Woode ("ALJ") held a video hearing on December 17, 2012, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 45-76.)  Julia A. Russell, a vocational expert, also appeared and testified at the hearing.  (R. at 76-84.)  On May 1, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 19-32.)  On September 3, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-6.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she lives with her three-year-old daughter, who was placed in the hospital for five days as a baby and put on a feeding tube.  (R. at 45.)  Plaintiff stated that Child Protective Services ("CPS") intervened right after the birth of her child and then again when her child was one-and-one-half years old, but that they closed her case with regard to the second instance.   (R. at 45-46.)

 Plaintiff indicated that she graduated high school and that she attempted to take some college courses, but only passed one course out of three courses.  (R. at 46-47.)  She stopped going to school after she became pregnant with her daughter.  (R. at 47.)  At the time of the hearing, Plaintiff was working part-time at an animal shelter cleaning animal cages and walking dogs.  (R. at 48-50.)  She had been working at the animal shelter for eleven months as of the hearing date.  (R. at 51.)  She testified that she believed that she was told she was "doing a satisfactory job" after her thirty-day probation, but that she did need to improve her cleaning.  (R. at 54.)  She indicated that she worked at the shelter eighty-six hours per month in order to receive a welfare benefit through Ohio Jobs and Family Services.  (R. at 50-51.)

Upon questioning from her attorney, Plaintiff testified that she has problems getting along with others when at work and outside of work, which results in altercations.  (R. at 58.)  She explained that after a year of working at a Burger King, she walked out because she got into an argument about her workload with her manager.  Plaintiff later testified that she remained employed at Burger King longer than her other jobs because she needed money for a place to stay because she had moved out of her mother's home.  (R. at 73, 75.)  She said that she was

subsequently fired from McDonald's after an altercation with her manager.  She said she also gets into arguments with her mom.  Plaintiff stated that she would not be able to do a full-time job because of her feelings of being overwhelmed, problems focusing, and difficulty understanding.  (R. at 58-59.)  Plaintiff testified that she also has problems with her mood and that she cries about twice a week out of frustration.  (R. at 59.)

She testified that she has problems handling money.  She gives her paycheck to her mother to pay her bills, with the exception of her rent, so that she would not spend her money on video games and going out to eat.  (R. at 64-65.)  Plaintiff obtained a driver's license a few months before the hearing.  It was her third time taking the written test and fourth time taking the driving test.  (R. at 67.)  She passed the written test because it was read to her through headphones.  (R. at 69.)

As to her activities of daily living, Plaintiff takes her child to day care and drives to work. (R. at 67-68.)  Plaintiff testified that she manages her savings account, uses ATMs when necessary, cleans her place occasionally, cooks, and grocery shops with her mother.  (R. at 66, 69-71.)  She indicated that her mother has sometimes helped her financially when she could not pay for baby supplies.  (R. at 66.)

**B.      Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past jobs include a fast food worker, bus person, dishwasher, and animal attendant.  (R. at 76-78.)

The ALJ proposed a series of hypotheticals regarding Plaintiff's residual functional capacity ("RFC") to the VE.  (R. at 78-79.)  Considering an individual of Plaintiff's age, education, and work experience and the RFC ultimately determined by the ALJ minus the

restriction of working in fast-paced environments or environments with high production quotas, the VE testified the individual would be capable of performing past relevant work as a bus person, dishwasher, and animal attendant. (R. at 79-81.) The VE further testified that the individual could also perform approximately 1,032,000 medium exertion, unskilled jobs in the national economy such as an industrial cleaner, hand packager, or automatic machine tenderer even if additionally limited to an environment where fast-paced production or high quotas were not required. (R. at 81.) The ALJ did not ask whether Plaintiff's past work could be performed with the additional pace-based restrictions. The VE also testified that if the individual was off task 15% to 20% of the work day or work week, she would not be able to perform unskilled work. (R. at 81-82.)

### III.    EDUCATIONAL, MEDICAL, AND EMPLOYMENT RECORDS

**A.    Pre- September 22, 2009 Alleged Disability Onset**

**1.    Gahanna-Jefferson School District/Hilliard City School District**

While in school, Plaintiff participated in learning disabled classes. (R. at 293-311.) Plaintiff's Individualized Education Program (IEP) for her senior year of high school focused on Restaurant Service. (R. at 299-309.) Plaintiff was exempt from the ninth-grade proficiency tests. (R. at 296.)

**2.    TCN Behavioral Healthcare ("TCN")**

Plaintiff received treatment at TCN in 2003. (R. at 377.) The treatment notes from TCN, dated from November 2006 through August 2009, reflect that Plaintiff received a variety of services, including medication management, group therapy, and community psychiatric supportive treatment. (R. at 377-571, 586-632.)

5

On November 26, 2007, Plaintiff presented for an updated psychiatric evaluation. Dr. Houseknecht noted that Plaintiff was calm and cooperative, that her mood was euthymic and that she was goal directed. He also noted that Plaintiff remembered limited details and oberserved that she was fidgety. He found that her current level of functioning was below average. (R. at 378.) Dr. Houseknecht continued Plaintiff on her Cymbalta with the diagnoses of dysthymic disorder and borderline intellectual functioning. (R. at 379.)

### 3. Mark D. Hammerly, Ph.D.

Dr. Hammerly evaluated Plaintiff for disability purposes on November 9, 2006. (R. at 645-54.) Plaintiff was driven to the appointment by her case manager from TCN. Plaintiff reported that her chief complaint was her learning disability and diagnosis of ADHD. (R. at 645.) Upon mental status examination, Dr. Hammerly observed that Plaintiff's appearance was appropriate and cooperative and that she maintained moderate eye contact. (R. at 647.) He also noted that Plaintiff's speech was impeded, and that her thought processes seemed logical and coherent. Dr. Hammerly described her affect was constricted and noted that she "seemed down at times" during the evaluation. (R.at 648.) He further noted that Plaintiff was alert and oriented and able to repeat four digits forward and four backwards, but that she displayed mild problems with concentration. As to her insight and judgment, Dr. Hammerly found that she had sufficient information, judgment, and common-sense reasoning ability to live independently and to make important decisions concerning her future. He opined that Plaintiff's social planning and judgment concerning real-world systems and concepts was somewhat deficient. He indicated that Plaintiff was estimated borderline when compared to the normative sampling distribution produced by the WAIS-III. (R. at 649.)

As to her daily activities, Plaintiff reported that she slept about five hours per night. She spent her days listening to music or sitting outside and watching animals. (*Id.*) Plaintiff reported that she does the cleaning and cooking, but a friend or her case manager take her grocery shopping because she does not have a driver's license. (R. at 650.)

On WAIS-III testing, Plaintiff obtained a Verbal IQ of 78, a Performance IQ of 76, and a full scale IQ of 75. (R. at 650.)

Dr. Hammerly diagnosed Plaintiff with a dysthymic disorder and borderline intellectual functioning. Dr. Hammerly opined that Plaintiff's mental ability to relate to others, including fellow workers and supervisors, is moderately impaired. He concluded that she would be able to relate sufficiently to coworkers and supervisors for simple, repetitive tasks, which did not require complicated or detailed verbal instructions and procedures. (*Id.*) He also opined that Plaintiff's ability to understand, remember, and follow instructions is mildly impaired. (R. at 653.) Dr. Hammerly found that Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks is mildly impaired. (*Id.*) Dr. Hammerly also opined that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity was moderately impaired. (*Id.*)

**B.      Post-September 22, 2009 Alleged Disability Onset**

   **1.      CPS Records**

In March 2010, Plaintiff was assessed due to issues with CPS after her newborn daughter had become dehydrated. (R. at 488-96.) She was diagnosed with ADHD, combined type; polysubstance abuse in full sustained remission; and rule out cluster B personality disorder traits. (R. at 495-96.)

7

Plaintiff was discharged on November 16, 2010, with her last regularly scheduled appointment taking place August 11, 2009.  (R. at 586, 590.)  It was noted Plaintiff needs coping skills to improve attention, but that she demonstrated a preference not to engage in the recommended therapy.  (R. at 587.)

### 2.    Eric Kahn, M.D.

Plaintiff treated with psychiatrist, Dr. Kahn, from December 2010 until at least September 2012, approximately every three months for medication management.   (R. at 334-60, 375-76, 633-44.)  When Plaintiff presented for treatment with Dr. Kahn, she indicated that she was last medicated approximately five months prior.  (R. at 339.)  A mental status exam revealed that Plaintiff's affect was pleasant, her thought processes normal, and that she was alert and oriented with intact cognition.  (R. at 343.)  Dr. Kahn diagnosed a mood disorder not otherwise specified and recommended ruling out an intermittent explosive disorder.  He placed her on Geodon.  (R. at  339-45.)  Dr. Kahn noted that Plaintiff "was strikingly pleasant and cooperative in the office today notwithstanding the vigorous testimony by the patient and the mother that she has had such difficult anger and behavioral problems across her entire life."  (*Id.*)

In January 2011, Plaintiff reported that she had discontinued taking Geodon due the sedating effects interfering with her need to take care of her child.  (R. at 346.)  Dr. Kahn formally discontinued the medication and prescribed Abilify.   In a February 2011 follow-up appointment, Plaintiff reported that the medication was working and that she did not feel depressed.  Dr. Kahn's mental status exam reflected normal findings with a pleasant mood and affect.  (R. at 349.)  In April and July 2011, Plaintiff again reported that the medication was working well, and Dr. Kahn again reported normal mental status examination findings.  (R. at 352, 255.)

8

Dr. Kahn completed a Mental Status Questionnaire in July 2011, in which he listed Plaintiff's diagnoses as a mood disorder, not otherwise specified and an intermittent explosive disorder. He reported Plaintiff's mood and affect as "normal or depressed," with normal insight/judgment, and no signs of significant anxiety. Dr. Kahn opined that Plaintiff was moderately impaired in her ability to remember, understand, and follow directions, and "considerably" impaired in her ability to maintain attention, sustain concentration, persist at tasks, and complete tasks in a timely fashion. He also opined that Plaintiff had "some impairment of concentration and memory due to depression." (R. at 334-36.)

Dr. Kahn next saw Plaintiff in October 2011. Dr. Kahn stated that Plaintiff "was pleasant in the office but announced she has been feeling more depressed in the past several weeks." (R. at 358.) Dr. Kahn noted that because Plaintiff had only been taking 5mg of Abilify, it was "reasonable to try a more normal dose" of 10mg. (*Id.*) His mental status exam findings were again normal. (R. at 358.) In September 2012, Plaintiff reported that she continued to find her medication helpful. Dr. Kahn's mental status examination again reflected normal findings, and he continued her dose of 10mg of Abilify. (R. at 633.)

Plaintiff reported doing well again in January and March 2012. Dr. Kahn again noted no change in her normal mental status examination findings and continued her medication. (R. at 639, 642.) In June 2012, Dr. Kahn noted that Plaintiff "was in good spirits" and that she "continues to be pleased with the medications." (R. at 636.) Dr. Kahn again noted no change in her normal mental status examination findings and continued her medication. (*Id.*)

On November 28, 2012, Dr. Kahn completed a medical source statement in which he opined that Plaintiff was not able to consistently remember, understand, and follow simple directions "due to impairment of concentration and memory due to depression." (R. at 375.) He

9

also opined that Plaintiff was unable to consistently maintain concentration for two-hour periods of time and keep a regular work schedule and maintain punctual attendance.   He further found that Plaintiff was unable to consistently and appropriately interact with supervisors, coworkers, and the public and that she could not consistently withstand the typical stresses and pressures of unskilled work.  Finally, Dr. Kahn opined that that Plaintiff's mental impairments affected her ability to work at a reasonable pace.  (R. at 375-76).

### 3. Richard Litwin, Ph.D./Bureau of Vocational Rehabilitation ("BVR")

Plaintiff was evaluated by Dr. Litwin on behalf of the BVR on November 3, 2011.  (R. at 370-74.)  Plaintiff was administered a WAIS-IV, which resulted in a VCI (verbal comprehension index) of 74, a PRI (perceptual reasoning index) of 69, and a full scale IQ of 64.  (R. at 371.)  Dr. Litwin found processing speed was consistent with these IQ scores showing expected slowness in work pace.  A particular weakness was noted in working memory with a small window for taking in new information and restricted "buffer space" for being able to hold information in brief storage for additional manipulation.  (*Id.*)  Dr. Litwin reported that Plaintiff's achievement testing scores "generally fell near or at the expected range given her low IQ."  (R. at 372.)  Dr. Litwin also noted that Plaintiff had a low frustration tolerance and was prone to becoming irritated easily.  Based upon the a symptom checklist Plaintiff completed, "[o]nly minor depression was noted."  (*Id*.)

Dr. Litwin diagnosed a depressive disorder, ADHD, and mild mental retardation.  (R. at 373.)  Dr. Litwin found that Plaintiff's congnitive limitations would limit impact her higher-level learning and require hands-on training.  He opined that Plaintiff's work pace would likely be slow with no ability to multi-task efficiently.  Dr. Litwin concluded, "Given Jenette's low IQ, it's

10

unclear if she can work in a competitive work environment and sustain long term employment. She may wish to consider supportive employment through the CBDD or seek jobs that are very low skill."  (R. at 373-74.)

### 4. State-Agency Evaluations

On July 7, 2011, after review of Plaintiff's medical record, Melanie Bergsten, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that Plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration.  (R. at 108.)  She further determined that the evidence did not establish the presence of the Listings' Part "C" criteria.  (R. at 108-09.)   Dr. Bergsten concluded that Plaintiff's mental RFC was an adoption of the prior ALJ decision from September 2009, under Acquiescence Ruling 98-4 (*Drummond* Ruling).[1]  (R. at 109.)

On November 11, 2011, state-agency psychologist Karla Voyten, Ph.D., reviewed the medical evidence upon reconsideration and affirmed Dr. Bergsten's assessment.  (R. at 123-28.)

---

[1]According to Acquiescence Ruling 98-4(6), where a final decision of the Social Security Administration after a hearing on a prior disability claim contains a finding of a claimant's residual functional capacity, the Social Security Administration may not make a different finding in adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim unless new and additional evidence or changed circumstances provide a basis for a different finding of the claimant's residual functional capacity.  *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997).  In this case, the ALJ found that Plaintiff's circumstances did provide a basis for a different RFC finding and that Acquiescence Rule 98-4(6) did not apply to her decision.  (R. at 19.)

### 5.    Knox County Dog Warden

At Plaintiff's request, her supervisor at the Knox County Animal Shelter completed an evaluation form on November 30, 2012.  Her supervisor circled a number reflecting that Plaintiff's performance "regularly meets requirements" in the areas of actively pursuing completion of assigned work and meeting deadlines; demonstrating a consistent pattern of satisfactory attendance, promptness, and work ethic on the job; responding to requests for service and assistance; and encouraging and supporting coworkers.  Plaintiff's supervisor circled numbers reflecting that he found her performance was "unsatisfactory" in the areas maintaining high-quality work relative to established standards; consistently following office policies and procedures; accepting responsibility; committing to doing the best job possible; establishing clear work objectives and priorities; effectively handling multiple assignments simultaneously; and meeting challenges with resourcefulness.  In all other aspects of her employment, Plaintiff's supervisor circled a number that reflects his opinion that her performance "needs improvement." (R. at 321-22.)

On January 5, 2013, Plaintiff's supervisor drafted a letter upon request of her counsel, which states in pertinent part as follows:

> [Plaintiff] seems to have trouble staying focused on her duties at the shelter.  She does not follow through with a task.  She has been properly trained and then re-trained at least twice.  I am no longer the County Dog Warden and now am concerned that whoever takes my place simply may not be so patient and willing to work with [Plaintiff].  With that being said, [Plaintiff] seems to have a strong desire to be here every day.  She seems to really care for the dogs and enjoys talking to the public about the characteristics of the dogs they are looking at.  Also, [Plaintiff's] attendance has been exceptional.  Any time she had missed has been immediately made up.

(R. at 320.)

12

## IV.   THE ADMINISTRATIVE DECISION

On May 1, 2013, the ALJ issued her decision.  (R. at 16-32.)  The ALJ concluded that Plaintiff met the insured status requirements through September 30, 2010.  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantially gainful activity since September 22, 2009, the alleged onset date.  (R. at 22.)  The ALJ found that Plaintiff had the severe impairments of ADHD, combined type, depressive disorder, and borderline intellectual functioning.  (*Id.*)  She further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 23.)  At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but the claimant is limited to performing simple, repetitive tasks

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Is the claimant engaged in substantial gainful activity?
2.      Does the claimant suffer from one or more severe impairments?
3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.      Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> involving no complicated or detailed verbal instructions.  She can have occasional
> and superficial interaction with coworkers and occasional interaction with the
> general public.  Additionally, the claimant can work in an environment that does
> not require fast-paced production or high production quotas.

(R. at 25.)  In reaching this determination, the ALJ accorded "some weight" to the opinions of

the state-agency reviewing psychologists Drs. Bergsten and Voyten, finding their "B criteria"

opinions were "consistent with the claimant's activities of daily living and supported by the

longitudinal medical evidence."  (R. at 29.)  The ALJ explained that she had included more

specific functional limitations that allowed for occasional and superficial interaction with others,

adding that those limitations are supported by Plaintiff's continued part-time work and her

interactions with family and people at stores.  The ALJ also assigned "some weight" to the

assessment of Dr. Hammerly, noting that it "is consistent with the claimant's activities of daily

living after the current alleged onset date, along with the claimant's treatment history."  (*Id.*)

The ALJ accorded "little weight" to the opinions of Dr. Kahn, finding them inconsistent with

Plaintiff's significant activities of daily living, which she noted included working and caring for

a child.  (*Id.*)  She also noted that Dr. Kahn's opinion did not provide specific functional

limitations and that the generalized statements "do not provide residual functional capacity

guidance."  (*Id.*)  The ALJ further stated that she assigned "very little weight" to the third-party

reports of Plaintiff's supervisor.  As to Plaintiff's credibility, the ALJ concluded that Plaintiff

was significantly less restricted than she has otherwise indicated.  (R. at 28.)

Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform her past

employment.  (R. at 30.)  She then went on to make an "alternative finding," again relying on the

VE's testimony to conclude that Plaintiff could perform other jobs that exist in significant

14

numbers in the national economy, including the representative jobs of industrial cleaner, hand

packager, and automatic machine tender.  (R. at 30-31.)  The ALJ therefore concluded that

Plaintiff was not disabled under the Social Security Act.  (R. at 32.)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

15

where that error prejudices a claimant on the merits or deprives the claimant of a substantial

right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746

(6th Cir. 2007)).

## VI.   ANALYSIS

In her Statement of Errors, Plaintiff advances three contentions of error that she maintains

warrant reversal.  Plaintiff first asserts that the ALJ erred in relying on the VE's testimony to

conclude that Plaintiff can perform her past work.  She next asserts that the ALJ erred in

evaluating the opinion of her treating psychiatrist, Dr. Kahn.  Finally, Plaintiff maintains that the

ALJ erroneously failed to consider critical aspects of the statements her supervisor at the animal

shelter.  The Undersigned addresses each of these contentions of error in turn.

### A.   Reliance upon the VE's Testimony

Within this contention of error, Plaintiff points out that the ALJ omitted the pace

restriction from the hypothetical question to the VE regarding her ability to perform her past

employment.  She therefore asserts that the ALJ cannot rely upon the VE's testimony concerning

her ability to perform her past work.  The Commissioner does not dispute that the ALJ erred in

this regard.  She contends, however, that any such error was harmless given the ALJ's alternative

finding that Plaintiff could perform other jobs existing in significant numbers in the local and

national economies.  The Commissioner maintains that the ALJ did not err in relying on the

VE's testimony concerning the other jobs because the hypothetical question posed included all of

the limitations the ALJ included in Plaintiff's RFC.

As a threshold matter, the Undersigned agrees with Plaintiff that the ALJ erred in relying

upon the VE's testimony concerning her ability to perform her past employment.  "In order for a

VE's testimony to constitute substantial evidence that a significant number of jobs exists, the questions must accurately portray a claimant's physical and mental impairments." *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011).  As Plaintiff points out, the ALJ failed to include the pace restriction she ultimately assessed in her hypothetical question to the VE concerning Plaintiff's ability to perform her past work.  Because the question failed to include all of Plaintiff's limitations, the VE's testimony cannot serve as substantial evidence supporting the conclusion that she can perform her past work.  The ALJ therefore erred in relying on the VE's testimony in this regard to conclude that Plaintiff would be able perform her past work.

This error is, however, harmless in view of the ALJ's alternative step-five finding.  As discussed above, the ALJ continued her analysis at step five of the sequential analysis and alternatively found that Plaintiff was capable of performing other jobs existing in significant numbers in the national economy, including industrial cleaner, hand packager, and automatic machine tender.  (R. at 30-31.)  In making this finding, the ALJ relied upon the VE's uncontroverted testimony, which was, in turn, was premised upon a hypothetical question that accurately portrayed all of Plaintiff's limitations that the ALJ found credible.  Under these circumstances, the ALJ's error in relying upon the VE's testimony to conclude that Plaintiff could perform her past work was harmless.  *See, e.g.*, *Simpson v. Comm'r of Soc. Sec.*, No. 1:13-cv-640, 2014 WL 3845951, at *13-14 (S.D. Ohio Aug. 5, 2014) (finding that ALJ's erroneous conclusion that the claimant could perform her past work amounted to harmless error where the ALJ alternatively relied upon uncontradicted VE testimony to conclude that claimant was capable of performing other jobs in the national economy).

In is therefore **RECOMMENDED** that Plaintiff's first contention of error be **OVERRULED**.

**B.      Consideration of Dr. Kahn's Opinions**

The Undersigned likewise finds that ALJ did not commit a reversible error in evaluating Dr. Kahn's opinions.  An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ."  20 C.F.R. § 416.927(c)(2);  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 408 (6th Cir. 2009).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

18

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

19

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

In the instant case, the parties do not dispute that Dr. Kahn, Plaintiff's psychiatrist, is a treating physician. As set forth above, the ALJ considered Dr. Kahn's opinions, but accorded them "little weight," finding them to be inconsistent with Plaintiff's significant activities of daily living and further noting that Dr. Kahn's generalized statements failed to provide RFC guidance. (R. at 29.) The ALJ also acknowledged that Dr. Kahn was Plaintiff's treating psychiatrist and considered that he had treated Plaintiff beginning in December 2010 through September 2012. The ALJ further pointed out that Dr. Kahn's treatment notes reflected that Plaintiff had consistently reported that she was doing well and that Dr. Kahn had consistently observed Plaintiff to have normal mental status examination findings and had also observed her to be pleasant and in good spirits. (R. at 27 (discussing Dr. Kahn's treatment notes from December 2010 through September 2012).)

According to Plaintiff, the ALJ's foregoing evaluation of Dr. Kahn's opinions is deficient because she failed to explicitly discuss "the details of [the] more specific limitations" Dr. Kahn opined. (Pl.'s Statement of Errors 15, ECF No. 15.) She next asserts that the ALJ failed to supply good reasons for discounting Dr. Kahn's opinions. In particular, Plaintiff argues that the

20

ALJ's reliance on her activities of daily living was improper given that CPS was involved with regard to her care of her child and that her supervisor's statements reflect her struggles to perform her part-time position.  Plaintiff also asserts that the ALJ's statement that Dr. Kahn's "generalized statements do not provide residual functional capacity guidance," (R. at 29) fails to provide good reasons for the weight she attributed to the opinions.  Finally, Plaintiff asserts that the ALJ erroneously failed to consider the factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c) in assessing how much weight to assign Dr. Kahn's opinions.

The Undersigned finds each of these challenges to be without merit.  First, no procedural rule requires an ALJ to explicitly mention and discuss each and every aspect or sub-opinion of a treating physician's opinion to prove that that the ALJ considered the opinion in its entirety. *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion.")  Here, the ALJ explicitly acknowledged that Dr. Kahn had offered two opinions and made clear that she had considered both of them.  (R. at 29.)

Second, the Undersigned finds that the ALJ provided legally sufficient reasons for assigning Dr. Kahn's opinions little weight, satisfying *Wilson's* good-reason requirement.  The ALJ found that Dr. Kahn's opinions conflict with Plaintiff's activities of daily living.  *See* 20 C.F.R. § 404.1527(c)(3) (identifying "consistency" with the record as a whole as a relevant consideration); *Blakley*, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)) ("'[I]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if . . . it is inconsistent the with other substantial evidence in the case record.'").

21

The ALJ pointed out in her opinion that Plaintiff cares for her three-year-old daughter and has done so since birth and that Plaintiff's mother only helps out if she cannot pay for supplies.  (R. at 23, 26, 29.)  The ALJ further observed that Plaintiff had, at the time of the hearing, worked part-time for the animal shelter where she sometimes answered the phones and cleaned cages and walked dogs.  (R. at 26, 29.)  The ALJ also noted that Plaintiff manages her savings account, uses ATMs when necessary, cleans her house, drives, cooks, shops, graduated high school, and even passed a college course.  (R. at 23, 25, 26.)

The Undersigned further finds that the foregoing activities of daily living that the ALJ highlighted in her decision constitute substantial evidence supporting the ALJ's determination that Dr. Kahn's opinions conflict with Plaintiff's activities.  For example, Dr. Kahn opined that Plaintiff was unable to keep a regular work schedule and maintain punctual attendance.  Yet Plaintiff's supervisor provided feedback that she had regularly demonstrated a pattern of satisfactory attendance and promptness, (R. at 321-22), and subsequently stated that Plaintiff's "attendance has been exceptional," (R. at 320).  Similarly, Dr. Kahn's opinion that Plaintiff is unable to consistently and appropriately interact with supervisors, co-workers, and the public is undermined by Plaintiff's daily interaction with her family, people at stores, and at her current employment.  Indeed, Plaintiff's supervisor noted that Plaintiff "enjoys talking to the public about the characteristics of the dogs they are looking at."  (R. at 320.)

Third, Plaintiff's reliance on the involvement of CPS at some point during her child's life to challenge the ALJ's reliance upon her activities of daily activities is misplaced.  As the Commissioner points out, Plaintiff has produced no evidence that CPS took any significant action, but instead testified that CPS closed her case more than 1.5 years prior to the hearing with

22

no additional involvement since that time.  Plaintiff's criticism of the ALJ's reliance upon her

part-time work to demonstrate inconsistency with Dr. Kahn's assessment is equally unavailing.

Accordingly to Plaintiff, some of her supervisor's statements support her alleged limitations.

But, as discussed more fully below, the ALJ did not find those particular statements to be

credible.

   Fourth, the ALJ did not err in noting that Dr. Kahn's "generalized statements . . . do not

provide residual functional capacity guidance."  (R. at 29.)  Even Plaintiff acknowledges that Dr.

Kahn's first opinion was "less specific."  (Pl.'s Statement of Errors 15, ECF No. 15.)  By way of

example, Dr. Kahn generically stated that Plaintiff had "some impairment" in concentration and

memory, but failed to elaborate how that might translate into functional limitations.  And

although Dr. Kahn's second opinion offered slightly more specific guidance, it consisted

primarily of yes or no answers to form question with no explanation beyond a reference to

Plaintiff's diagnoses in some instances.  Notably, Dr. Kahn failed to explain how he arrived at

his conclusions or to otherwise provide support for any limitations opined in either of his

opinions.  *See* 20 C.F.R. § 404.1527(c)(3) (identifying "supportability" as a relevant

consideration).

   Finally, the Undersigned rejects Plaintiff's assertion that the ALJ erred in failing to

consider the "examining relationship, nature and extent of treatment relationship, consistency,

supportability, and specialization" in assessing Dr. Kahn's opinions.  (Pl.'s Statement of Errors

17 (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)).)  As set forth above, Plaintiff is correct, that

the ALJ must consider these and other factors in determining what weight to accord Dr. Kahn's

opinion. *See Wilson*, 378 F.3d at 544.  There is no requirement, however, that the ALJ

"expressly" consider each of the factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, No. 09-6081, 2010 WL 3521928, at *6 (6th Cir. Aug. 31, 2010) (indicating that, under *Blakely* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(d)(2) for weighing medical opinion evidence within the written decision).  Regardless, in the instant case, the ALJ's decision makes clear that she *did* consider the factors Plaintiff enumerates.  As discussed above, the ALJ obviously considered consistency as a factor in finding that Dr. Kahn's opinions were inconsistent with the record evidence of Plaintiff's activities of daily living.  The ALJ also discussed Dr. Kahn's examining relationship, the nature and extent of the treatment relationship, and his specialization. Specifically, the ALJ noted that Plaintiff self-referred for treatment with Dr. Kahn, a psychiatrist, on December 13, 2010, and that the treatment was ongoing through at least September 27, 2012. (R. at 27.)  Lastly, the ALJ considered the supportability of Dr. Kahn's opinions in two ways. First, she pointed out that Dr. Kahn's opinions consisted at least in part of generalized statements.  (R. at 29.)  Second, the ALJ pointed out that Dr. Kahn observed Plaintiff to have normal mental status examinations, that treatment notes reflected that Plaintiff reported that she was doing well, and that Dr. Kahn observed that Plaintiff's medications worked well, all of which clearly do not support Dr. Kahn's more extreme opinions.  (R. at 27.)

In sum, it is **RECOMMENDED** that Plaintiff's second contention of error be **OVERRULED**.

## C.    Consideration of Plaintiff's Supervisor's Statements

Plaintiff's final contention of error—that the ALJ erroneously failed to consider critical aspects of the statements from her supervisor at the animal shelter—is equally without merit.

24

Contrary to Plaintiff's assertion, the ALJ's decision makes clear that she considered Plaintiff's supervisor's statements and evaluation, but found them to be largely unreliable.  As noted above, the ALJ assigned "very little weight" to the reports of Plaintiff's supervisor, explaining as follows:

> While the November 2012 evaluation contains lower scores in innovation and independence, [Plaintiff] has been able to maintain this job for the past nine months, suggesting that she has been able to satisfactorily meet the requirements of the job.  Further, the undersigned questions the validity of the evaluation findings as [Plaintiff] testified that she asked her manager for this evaluation so that she could provide it for her disability hearing.  Additionally, [Plaintiff] testified that she received satisfactory scores during her 30-day evaluation, which has not been provided to the undersigned despite repeated request.  Instead of the 30-day evaluation, a letter from [Plaintiff's supervisor] was provided which stated that [Plaintiff] has some trouble focusing and following through, but she does retain a strong desire to work along with exceptional attendance.  This letter does not suggest that [Plaintiff] has been unable to perform her part-time work though since [Plaintiff's supervisor] has continued to employ [Plaintiff].  Moreover, any mention by [Plaintiff's supervisor] that [Plaintiff] has trouble focusing and completing tasks is contradicted by her continued ability to care for her child and maintain a household.  Therefore, the undersigned gives these third party reports very little weight.

(R. at 28-29 (internal citations to the record omitted).)  This discussion makes clear that the ALJ considered, but rejected those aspects of Plaintiff's supervisor's opinion that conflicted with the RFC she assessed.  The Undersigned finds no err in the ALJ's consideration and assessment of Plaintiff's supervisor's statements and evaluation.

Accordingly, it is **RECOMMENDED** that Plaintiff's third and final contention of error be **OVERRULED**.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  February 12, 2016                    _____/s/ *Elizabeth A. Preston Deavers*_____
                                            ELIZABETH A. PRESTON DEAVERS
                                            UNITED STATES MAGISTRATE JUDGE